We'll hear argument next in Case 17-269, Washington v. United States. Mr. Purcell. Thank you, Mr. Chief Justice, and may it please the Court. The State of Washington wants to protect Salmon and has voluntarily spent billions of dollars to achieve that goal. Our objection is the unworkable treaty right the Ninth Circuit announced. Respondents have abandoned that Court's reasoning here, but the alternative theories that they offer were not addressed by the courts below and cannot support the judgment, so this Court should reverse, or at most, should clarify what legal rule the treaty has imposed and then remand to the district court to apply it. I think you mean at least, right? Well, sorry, we'd prefer that you reverse. Sorry, how do you want to clarify? Yeah, at most, at least. Sorry. Sorry, Mr. Chief Justice. You're the better oral advocate. I'll stipulate that. The central question, though, is what legal standard the treaties apply, impose. And again, the Respondents have abandoned the rule that the Ninth Circuit advanced, and rightly so. And instead, they're arguing a new theory. But even under that theory, the treaties would regulate virtually every significant human activity off reservation, and Federal courts in the Northwest would be regulating, essentially would be imposing environmental laws, would be the primary environmental regulators, rather than leaving most decisions to State and Federal policymakers, as should be the case. In the courts below, during the argument in the Ninth Circuit, you said the Stevens Treaty would not prohibit Washington from blocking completely every salmon stream into Puget Sound. Basically, the right to take fish to you means the right to take fish. Is that correct? I remember that answer well, Your Honor, and that was a mistake at oral argument about how our theory — So what is your position now? When can you and how much can you block fish? So, Your Honor, we believe that to show a treaty violation, the tribes should have to show four things, that a State barrier is causing a large decline in a particular river, and that it's not justified by substantial public interest. I don't know. I don't know that it's a large decline. I think it has to be a material decline, no? Well, it — Every — every — The precise word, Your Honor, we're less concerned about than that it be a meaningful decline, because otherwise, as I was saying, the concern is that there are many, many things that affect salmon, Your Honor, from zoning decisions to climate change to transportation. And if you don't set the bar at least at some reasonable level — Well, don't you think the court below did? No, Your Honor. The court below explicitly said that Respondents did not need to show And just said that any diminishment is a treaty violation. And under that rule, that's why courts applying the treaties will be — Well, it didn't quite do that, because as I look at its remedy, it — it chose not to have you fix culverts that were — were degradating the fish, but it said they can wait until the normal life of the culvert ends. Your Honor, that — And so — Sorry. And also gave you leeway, rather substantial leeway, 200 culverts, I think, or over 200, not to fix at all. So what the court did was take your plan and accelerate it. You made the judgment already. Your Honor, the court told us we could defer until the end of the useful life culverts that had less than 200 meters upstream of useful habitat. Mm-hmm. So the — the — those are culverts that will make extremely little difference to be replaced, and each one costs several million dollars. So that's — And the court excluded those. Well, the court said that those are the ones we could do at the end of the useful — at the end of the useful life. Well, that means because if you don't do it then — Fair enough, Your Honor. — it's going to fall down. My point is the court did not exclude ones even where there's another barrier 10 yards upstream or 10 yards downstream that the State does not control.  But they gave you the discretion to exclude those. No. The judge said that we could defer culverts blocking 10 percent of the habitat. Mm-hmm. But that — that — the problem is that that doesn't — it measures in exactly the wrong way. So we could — we — It gave you the choice to measure it. No, no. It measures by how much habitat is upstream regardless of other barriers. So the State is more incentivized under this ruling to replace a culvert that has 10 miles of habitat upstream even if there are five downstream barriers that prevent any salmon even from reaching the State barrier. Well, I think your adversaries told me that there aren't hardly any culverts downstream, that virtually all of them are upstream from you. I don't think they would characterize it that way. And if they would, it's incorrect, Your Honor. We showed in our reply brief, at the end of our reply brief, a sample of 315 State culverts, 220 had downstream barriers. So it's not — it's true that many more barriers may be upstream, but there are still hundreds and hundreds downstream. And that — this all highlights, Your Honor, the first treaty point, that the Respondent should have to prove the effect of specific State culverts on particular rivers. And that just was completely glossed over by the district court here. The fact that a tribe — each tribe has its own separate treaty fishing rights and its own historic fishing places. And a tribe near Seattle might well be able to show that culverts on an upstream near Seattle are affecting its right of taking fish. That doesn't say anything about the effect of culverts on the Olympic Peninsula hundreds of miles away, where the culvert might be in a completely different place in the watershed. There might be different species of salmon. There might be other habitat issues. And that the district court didn't — just didn't require at all that type of evidence about the effect on particular rivers. And that's also crucial under this Court's decision in Fishing Vessel, where the Court said that the treaty right of sharing fish is measured on a river-by-river basis. So it's really crucial that the analysis be done in that more precise way. JUSTICE SOTOMAYOR I'm just still having a hard time. As I understood it, the district court essentially took your plan of remediation that was going to take 99 years, and it condensed it to 17. So it took all of your own studies and your own decisions about priority and what studies needed to be done to accelerate what projects faster than others, and gave you the opening to come back and tell them why you were wrong and why something should be deferred or not. And you just didn't participate in the injunction. So why should we remand to do something you refused to do when given the opportunity? MR. CLEMENT First of all, Your Honor, the Ninth Circuit was incorrect when it said we refused to participate in the injunction. The plaintiffs filed a proposed injunction. One week later, we filed a post-trial brief that raised every single objection I'm raising here today. If you look at Joint Appendix 28, its docket entry 663, the filing itself is not in the appendix, but it's available on PACER. And if you read it, you'll see we raised every single objection I'm raising here. We also raised them at closing argument several months later. Three years passed, and the district court entered the exact injunction that respondents had asked for without addressing any of the concerns we raised. And so it's just not right. The Ninth Circuit was just incorrect when it said that we had not participated.  Alitoson Could you say again what you think the standard is? The treaty talks about the right of taking fish. What do you think that means? MR. CLEMENT Well, it's clear that it guarantees three important rights, Your Honor, this Court has recognized. A right to access historic fishing places, that's winnings. A right of fair share of the available fish, that's fishing vessel. And then a right to be free of certain types of State actions that are not justified by substantial public interest. And applied here, we think that means that the plaintiffs need to show that State barriers are causing a large decline in a particular river and that it's not justified by substantial public interest. Alitoson And what is the difference between that and the Federal Government's position about substantially degrading the supply of salmon? MR. CLEMENT Well, Your Honor, for one thing, I'm not sure whether they would limit their rule to obstructions. And we think that that's important because the parties stipulated early in this case, Petition Appendix 173 to 74, that that's all this case was about. So that's one potential difference. It's also what all the briefing here is focused on. Alitoson All right. But as to this case, which involves supposed obstructions, that's not a difference between the two positions. MR. CLEMENT Okay. I just want to – that's important. So second, the way they've defined substantial degradation here, as we explained in our brief, that the highest estimate they gave of the effect of culverts on salmon is a fraction of 1 percent of historic harvest. So if you define it that way, it just – the treaty has become a catch-all environmental statute that will regulate every significant – Alitoson So what – again, what – they say substantial degradation and you say what? MR. CLEMENT We've said large decline, Your Honor.  Alitoson A large decline. MR. CLEMENT I'm not being – I don't want to be picky about the word. The word is less important to us than the concept that it be meaningful. And – Alitoson Well, I don't understand what either of those things means. I don't know whether it's substantial degradation or a large decline. MR. CLEMENT I think it's more than a fraction, 1 percent of historic harvest or 5 percent of recent harvest. We think, for example, certainly a decline of half the salmon would certainly easily qualify. But they haven't alleged – you don't – I don't think you need to – MS. SOTOMAYOR I mean, do you have a number in your head? MR. CLEMENT Well, again, I think that a decline of half or anything approaching half would obviously be a large decline, a substantial decline. But certainly, something between 1 and 5 percent is not a substantial decline. And – MR. GOTTLIEB 5 percent is often deemed a material number in other contexts of law. So why wouldn't it be here?   MR. GOTTLIEB 5 percent decline in stock price or something like that is often used as a point of reference in securities law, for example. MR. CLEMENT Several points about that, Your Honor. First of all, the 5 percent was – we were just saying that's 5 percent from very recent harvest level. So that essentially holds against the State every other thing that has reduced salmon numbers, including Federal dams and many, many other actions. So essentially, it's saying – MR. GOTTLIEB As opposed to a materiality argument. They're two different elements. MR. CLEMENT Fair enough. I guess what I'm saying is that the denominator matters. When you measure from is important. And what the plaintiffs are asking you to do is just say when we file our lawsuit, it's causing 5 percent of the decline. MR. GOTTLIEB Again, I understand the causation argument. There might be other causes for the 5 percent decline, and we'd want to argue those. But this 5 percent, if they could show that 5 percent is attributable to the culverts, would that suffice to satisfy you? MR. CLEMENT I don't think it would. MR. GOTTLIEB What's your number?  CLEMENT Well, again, I think, you know, something approaching half would obviously qualify. I don't think 5 percent should suffice, because otherwise, again, the range of things that will affect 5 percent of the salmon. MR. GOTTLIEB So the treaty which guarantees the right to all usual and customary fishing grounds really means half of them? MR. CLEMENT No, no, no. No, that's not what I mean at all, Your Honor. We're talking about measuring in a particular river what has the decline been. Alito I don't even understand why decline or degradation matters. Suppose that there were more salmon than anybody knew what to do with, and then there was the State did something that caused a decline. Would that be a violation of the treaty? MR. CLEMENT I don't think that would be a violation even under the Respondent's theory, Your Honor. I don't think that would be, no. And that recognizes the crucial other piece of language that is in the treaties is that the treaty ceded control of the off-reservation land to the future government to regulate in the public interest. And so the government has to have the ability to make some types of decisions, even if they affect the treaty fishing right when there are substantial interests involved. MR. GOTTLIEB For me, I think that's really where the case boils down, and I'm struggling with that, right? You assert that you have rights to pursue other public goods and that those can outweigh the treaty effectively. And so any violation of these culverts has to be weighed against the benefits they provide to other persons. But doesn't that potentially eliminate the treaty altogether? And wouldn't it defeat it entirely? The point of a treaty, I would have thought, would have been to freeze in time certain rights and to ensure their existence in perpetuity, regardless of what other social benefits the later municipality might be able to claim.  GOTTLIEB Your Honor, we're not saying at all that they outweigh the treaty. We're saying that the treaty recognized — in the treaty, it recognized that there were other interests, that the future government would regulate the off-reservation land. And it's just not plausible that the parties intended that the triumph of the treaty — MR. BOUTROUS No, surely it allowed — the whole point of the treaty was to give up land. I understand that. But I don't see anything in the treaty — maybe you can point it to me. Maybe I'm just missing it textually. Anything in the treaty that says, and your rights at those usual and customary grounds and stations is limited by and may be completely eliminated if necessary to meet other domestic interests that a municipality might have, which is, I think, the position you're taking, I think, before this Court. GOTTLIEB Not exactly, Your Honor. The treaty right — first of all, there's the cession language. There's the right in common. And then if you look at this Court's decisions in the Puyallup cases, this Court said that the State could completely shut down fishing, if necessary, for important State interests. That case was only about conservation. But the principle has to be broader, like things like public safety or public health. MR. BOUTROUS Why? Why does it have to be broader? I would have thought a treaty would have been the supreme law of the land and would have overridden any municipal interests. And — MR. BOUTROUS Worse thing, it considered those — it considers those — so, for example, the State sometimes has to shut down all shellfish harvesting, excuse me, because of elevated bacteria levels in the water. And that affects Indian and non-Indian shellfish harvesters. And obviously, that affects the right of taking fish. The State's saying no one can harvest any shellfish right now. And I can't imagine that the other side would say that's a treaty violation, you know. Breyer. I don't understand what was the discussion. I'm having trouble for this reason. I thought that the district court had said — and I can't get the number — that since treaty times, the number of the fish have declined alarmingly. GOTTLIEB Yes. BREYER I don't know what alarmingly is supposed to refer to, but I think it's probably  GOTTLIEB Yes. BREYER Then he has a finding 161 where he says if you look at the whole watershed, the water — the barrier culverts are counting for 6 to 13 percent of the decline. And if you look at the tributaries, it's 44 percent to 58 percent. When I read something like that, I thought, well, that's a lot. So I don't have to worry about that issue. Now, you're going to tell me why I do have to worry about it. GOTTLIEB I will. BREYER Then I went and looked at what the court of appeals held, and it said we're not — if it's an act of God or some good reason, you know, and so forth, we're not saying you have to replace it. But we are saying where nothing like that is present, you do. Okay? On this schedule, which is a schedule — now, do I have it all wrong? Yes. GOTTLIEB I don't want to say you have it all wrong, Your Honor, but you have parts of it wrong.  Because, number one, that was a study of a single river, and it was a study of all barriers on that river, not state culverts. BREYER But, I mean, I can't go back and review — I can, but, I mean, it's pretty hard to start reviewing the details of a district court record unless there's something that you've told the court of appeals and told everybody else this is clearly wrong and so forth, which I haven't found. GOTTLIEB But the district court didn't make any finding that that was a sort of across-the-board effect. It was just citing a study about one river, and in that river, the effect of all barriers, not state culverts, all barriers, was 6 to 13 percent of the salmon. BREYER I said that was the whole watershed. So, apparently, you're saying that if, in fact, I looked at the record, I would discover that you showed it was very much lower. In fact, that number is wrong, and you, therefore, don't make this finding, and it's clearly erroneous, and that the court of appeals didn't consider it, and that we should reverse on that ground. Now, I haven't found that in your brief. GOTTLIEB That's not what I'm saying, Your Honor. I'm saying if the district court had said, I'm analyzing, I believe that was about the Skagit River. I'm analyzing the Skagit River, and the Skagit River state culverts are causing 35 percent of the decline in salmon runs. We're saying that might well be a treaty violation, if there weren't good reasons why, if there weren't substantial justifications, public interest for those culverts. But that's not at all what the district court did. The district court didn't say anything about the effects, other than that citing that particular rivers or particular places. And it varies dramatically. I mean, just as that finding of facts shows, the effect in tributaries is dramatically different than the effect in larger bodies of water.        Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Gottlieb I think you just gave an answer, and it went something like this. It said if there was a 30 percent decline and it wasn't for good reason, then there would be a treaty violation. So now we have a number, it says 30 percent, but you are continually putting in the tributaries. You are putting in this, and it has to be reasonless. It has to be unjustified. There can't be any reason why the State is doing what it's doing. And like Justice Gorsuch, I'm wondering where that is in the treaty. Well, I think it's in the session language, in common with language. What language are we pointing to? The fact that the tribes ceded control over off-reservation land to the future government to regulate. And, Your Honor, if you don't adopt that But this is, I mean, that cuts against you, General, because this is a compact, a contract made into Federal law in which the Indians gave up a very substantial thing. It gave up all their land, and it got something in return, which is the right to take fish. Absolutely. And we're saying there would need to be very substantial public interest, but at least that should be considered. So, for example, under the other side's theory, every single hydroelectric dam in Washington or in Idaho. But where does this public interest theory come in in the treaty? I thought this was an agreement. I give you my land. You give me the right to take fish. And let's just even make it narrower here. The right, I have the right that you will not put up obstructions on these streams such that I can't take fish. Well, Your Honor, if the rule is narrowly limited like that, it's much less problematic for the State. But there's also not, this finding would not support that rule, and it would outlaw every dam in the Northwest. So it's inconsistent with the party's longstanding behavior. The Federal Government built and licensed dams throughout the Northwest for decades starting in the early 1900s that completely obstructed rivers and decimated salmon populations, often over the State's objection. So if they're right that all you need to show is an obstruction and some level of decline, every single one of those dams is a treaty violation. Now, those aren't State dams. We're not. Sotomayor, we've had cases that have basically said, the example you used, if we're going to regulate fishing for the purposes of ensuring that there isn't degradation of fish, bacteria, some other form of fishing that would be more harmful than your catch, we've said that's okay. But if you're going to degradate for the benefit of the landowners as opposed to the people entitled to the fish, that you can't do that, because you have to make sure that the Indians receive their fair amount of the catch. So your substantial public need is not creating that difference for me. It's not defining what type of public need is proper. And that's fair enough, Your Honor. We think that to define that, courts, the district court could look at factors like those that Respondents have cited under the common law. Is this a total barrier? What are the public benefits of it? Was it justified by law? Was it authorized by law? Those sorts of things. And just is taking it out going to require a waste of public funds, as many of the culverts here would? Sotomayor, if you could have built this bridge in a way to permit free flow of fish, you seem to be saying that you can get out of that obligation merely because you wanted to spend less money. No, not at all, Your Honor. Not at all. We're saying we might well, under the theory I'm saying, I'm confident there are culverts that we've already taken out that would have violated this test. And they had, you know, they were blocking a significant number of fish on a particular river, and there was, cost-wise, there was no good reason to leave them in. I'm not saying we will always win under this test. I think, for example, the dams the Federal Government recently removed on the Elwha River, which will bring back more salmon than all the culverts in this case combined, is the estimate. Those would probably violate this test that I'm saying. I'm not trying to set out a test the tribes can never meet. My point is just they haven't met either this test or even their own test in the district court. The district court didn't apply this test because it wasn't before him. He didn't even find that the State's barrier culverts were all obstructions under the theory they're advancing here, because half the State's barrier culverts are only partial obstructions. And this is the case. Roberts, which test did you say the district court did not consider? The idea that, as I understand their theory here, is that obstructions that cause a substantial degradation are a treaty violation. And the phrase substantial degradation doesn't appear anywhere in the Ninth Circuit opinion, the briefing of the Ninth Circuit, the district court opinion. And also, the way they've defined obstruction here is essentially under the common law, and the common law allowed partial barriers. That's very clear. And that just wasn't an issue in the district court. So at least half of the barriers that are what we define as barrier culverts under State policy allow many fish to pass. Up to 90 — a barrier can be up to 90 — sorry, a culvert can be up to 90 percent passable, and the State still has made a policy choice to define that as a barrier culvert that we are going to remove at some point. But that doesn't make it a treaty violation. Breyer. The common law cases that we were able to find say things like there's a good Massachusetts case here. I just say it's good because it's from Massachusetts. But it says that impeding the passage of fish into the lakes or ponds where they by instinct prepare for multiplication of the species is a nuisance. And it doesn't say that, you know, it doesn't use a quantitative measurement. Well, but, Your Honor, as we explained in our reply brief, and we would have addressed this more in the opening brief had we known this was going to be an issue, but in our best to summarize, the common law also — there are three important differences between the theory they're advocating here and the common law. The common law proved it did not — if a barrier was for public benefit, it was not automatically a nuisance. Number two, the common law did not prohibit total barriers, and we've cited several treatises about that in cases. And number three — Breyer. No, Your Honor, but he hasn't. I mean, what's worrying me about this is I'm not sure what the disagreement is. It seems to me there is no disagreement, perhaps, on the common law tradition that a nuisance could consist of simply blocking fish from coming up the river into your area. And then it seems to me the Indians ought to have at least as much right as a person had under the common law, given the treaty. And then we seem to be arguing about what counts as an amount. And when I read through the briefs, I came away with the impression, well, whatever the amount is, there's certainly a lot of fish being blocked by the culverts. Now, suddenly here, I think, well, you're arguing, no, no, there weren't a lot, there were just a few. And I don't know quite how to deal with that argument. Your Honor, in part that's because the Respondents have completely changed the theory of the case from what the Ninth Circuit ruled to what they've argued in their response brief here. And so it's really only our reply brief that addresses the arguments they're making now. In the Ninth Circuit and the district court, the argument was any diminishment from historic harvest levels is a treaty violation, and that's essentially what the district court found and what the Ninth Circuit upheld. So what we're saying now is at least, I'll say it at least, at least there should be a remand for application of this new theory, because there's all sorts of evidence that wasn't relevant before that would be relevant now, like the fact about partial barriers, the fact that, as I said, half of the state's, quote, unquote, barrier culverts allow many fish to pass. And the district court just adopted our list, which we made for good policy reasons, but it doesn't mean that a partial barrier is a treaty violation just because, you know, 50 percent of fish can't get through it. So if there's — if the court, you know, has concerns about the details of the facts and such, keep in mind the district court found liability of the state had violated the treaties on summary judgment. I mean, the district court held us liable on summary judgment. So it's saying the factual issues essentially don't matter. Back in 2007, the whole trial was just about the remedy. So, I mean, you know, if the court disagrees with the rule we're saying here and it wants to adopt some version of theirs, the appropriate course would be to remand with direction to the district court. And if I may reserve the remainder of my time. Roberts. Thank you, counsel. Mr. Kedem. Mr. Chief Justice, and may it please the Court. When the United States promised the tribes Federal protection for their preexisting right to take fish, that included more than just the hollow promise of access to fisheries that could be blocked off and emptied of their salmon. I'd like to start by taking head-on the State's suggestion that we've changed our position in this litigation. And I don't want to mince words. The United States has never asked for and did not receive a ruling guaranteeing to the tribes a moderate living from their fisheries. Well, you may not have sought it, but isn't that what the Ninth Circuit panel did? It's not. And let me run you through what we understand to be the Ninth Circuit's ruling. Please. If you look at the beginning of the discussion section, page 86A of the petition appendix, you'll see that the Ninth Circuit posed the relevant question as follows. Whether the State was correct, quote, that it has no treaty-based duty to refrain from building and maintaining burial culverts. It then spends the next six pages refuting that argument based on the text of the treaty, the understanding of the parties, this Court's case law. Then six pages later on 92, the Court says, even if the treaties did not contain such protection explicitly, the Court would infer it. And then two pages later, we get the infamous sentence in which moderate living makes its first appearance. So at best, we're talking about something that supports an alternative holding. It's also not what the parties argued for. The State takes about a half-dozen quotations out of context from more than a thousand pages of record and briefing. If you want to know what the United States has asked for throughout this entire litigation, look at our demand for judgment. On page 62 of the joint appendix, you'll see that the very first thing that we asked for was a declaration. The very first thing that we asked for is a declaration that the State had an obligation under the treaties, quote, to refrain from degrading the fishery resource. That is the basis of the district court's ruling on page 27. There's an awful lot in your brief about the common law nuisance theory supporting the prohibition on physical barriers. That wasn't presented before, was it? No. That is evidence in support of what we took to be the central position that we've been arguing this whole time. And our point is that the State makes the argument that, well, there are exceptions or what the common law theory of nuisance with respect to barriers inhibiting access to fish is a complicated question. And you don't just say, well, it's a nuisance, so you win. There are responses. And they have not had an opportunity to test those. There hasn't been any evidence presented addressing those arguments. And I wonder if that means that we ought to send it back and let the courts who haven't had that opportunity yet have that opportunity. No, Your Honor. You could put aside all of the specifics of the common law. It really just goes to the central question that's been at the heart of this case, namely whether there is any substantive protection for the tribe's fisheries against actions to harm them. That is a basic point. Ginsburg. And on that basic point, can you explain the treaty language gives the tribes the right to take fish in common with all citizens? That's correct. Why does that mean anything more than simply what rights non-Indians enjoy, Indians also enjoy? That is, you could read it as a provision for nondiscrimination against Indians. But you read it as much more than a nondiscrimination provision, right? That's correct. Taking just the words, you could read it as an equal access provision. This Court in Fishing Vessel, however, found it unequivocal that the State was wrong in advancing an equal access argument there, that it provided some greater protection which the State now seems to concede includes substantive protection against harm that substantially degrades the tribe's fisheries. We also build in arguments not just based on the common law, but based on the course of dealing between the parties, representations that were made to the tribes, substantive representations. This paper secures your fish. Or Governor Stevens referred to the tribes as his children and said, I want for you the same things that I would want for my own children. Do the dams that the Federal Government has built on the Lower Snake River and the Lower Columbia River violate the treaty? So you're going to hear me say a number of times today the State didn't argue that or it's not in the record. And it's not because I'm trying to duck your question. I always have a second response. It's because there are certain legal issues that are not as developed either factually or in terms of legal concepts as we might expect at this stage. The answer is no. First of all, there are many Federal dams that are built with what are known as fish ladders. These are structures that are built in to allow the fish to pass either around the dam or over the dam. There are some instances where fish ladders are just not feasible. And in many of those instances, the United States has compensated the tribe for their harm to the fisheries, either through the Indian Claims Commission or in many cases through Federal legislation. Alitoson There are articles claiming that they have caused more damage to salmon than anything else. There are some dams. Alitoson And you say that what's good for the State of Washington is not good for the Federal Government? That's not correct. In many instances, the United States has repeatedly provided compensation. They have paid monetary compensation. They have put in fish ladders. They have put in hatcheries. And in some cases, the Army Corps of Engineers actually uses barges to transport young salmon down the river to go around the dam so they don't get hurt by it. We have taken extraordinary efforts to remediate some of the problems that have been caused by some of these Federal dams. Ginsburg What about the State's argument that the State was simply doing what the United States said was okay? It built these culverts in the end, consistent with Federal standards, and in some cases with Federal permits, right? Alitoson That is not correct. The State of Washington does not have a general permit under the Clean Water Act. The State of Washington does not have a general permit under the Clean Water Act. What they point to is a general engineering manual that has charts and tables which say that if you have this much headwater and a pipe of this diameter, you end up with this amount of outflow. It's about flood management. It says nothing about wildlife. It says nothing about treaty rights. They also point to a general permit under the Clean Water Act which, again, is just a blanket permit granted in advance. It doesn't take account or purport to take account of local conditions. The government doesn't review individual culverts for every single State road around the country. So there is no reason, even assuming that the State could find that the government was stopped as a result of this, there is no basis for claiming that the State was required by Federal law to build the culverts as they did. And in fact, they have changed the design of their culverts to allow for fish passage. There is no reason that they couldn't have done so from the beginning. Sotomayor, could you go back to the Chief Justice's original question? Your adversary is saying that the district court did not apply the definition of substantial appreciable material degradation. So we should send it back for it to make that first determination, which of these culverts substantially degrade, materially degrade. You've got to tell me what the right word is. And second, that they did not weigh whatever and however we define substantial public interest. And I'm still troubled by their refusal to give me a definition of that. That would not give them free reign to design things that will degrade materially a run only because they want to help some other landowner. So starting first with substantial degradation, I pointed you to page 270 of the Petition Appendix where the district court talked about significantly degrades. The district court made extensive factual findings at 157 to 162 of the Petition Appendix that there was substantial degradation caused by the State's barrier culverts to the tribe's fisheries. And those findings have not been challenged as clearly or erroneously. Kagan What would you use that term? Do you have a number in your head? So we don't have a number. I think you are talking about harm that is both durable and appreciable, meaning the type of thing that shows up year after year despite normal fluctuations. The district court didn't use a number, population number approach. It instead used a habitat-focused approach. And that made sense because there were extensive findings that there is a direct connection between the health of the fisheries and the populations of salmon. It also connected that to the amount of benefit that you would get, and this is at 166 to 168 of the Petition Appendix, from remediating the habitat. Roberts I just want to get back to, it was a while ago, but I understood you to say that Clean Water Act permits do not take account of local conditions? The Clean Water Act permit that we are talking about, the only thing that the State has pointed to, is a blanket permit that is granted in advance. And it says generally that you need to take account of these things, but it doesn't review individual culverts. It doesn't give a thumbs up or a thumbs down to particular culverts. But take account of these things. What are these things? Well, it sometimes mentions threats to wildlife or treaty obligations, but it doesn't, again, in advance tell you that you have in fact complied. Kagan Mr. Tuchman, when you read from the government's prayer for relief, as I heard it, it didn't have anything to do with obstructions or dams or culverts particularly. Tuchman That's elsewhere in the sentence. Kagan So you are arguing only with respect to obstructions today. Is that correct? Tuchman That's certainly all that's at issue here. We are not denying that in theory you could have some other harmful action by the State or someone else that also substantially degrades the fisheries. But that's obviously not it here. And quintessentially, we're talking about obstruction. Kagan And what is your view of the State's right under the treaty to take account of other public interests? Tuchman So we would describe it in the way that this Court did in the Puyallup trio, which is that the State can enact nondiscriminatory measures that are aimed at protecting the resource. So in the example that my friend gave about poisoning of shellfish or other fish, that would be an action that the State could take to reasonably protect the resource. That doesn't mean, however — Breyer Where does that come from, though? Because if you put it as the common law of nuisance, and there it appears to be, from my first read of defense, that there's another public good unrelated to the resource that might outweigh the problems of the nuisance and diminish it. So where do you get your rule from? Tuchman So the common law does not allow that as a defense as a general matter. They cite the Woolrich Treatise. Breyer Yes. Tuchman If you look at the very next sentence in that treatise, it makes very clear that an obstruction is not a nuisance simply because on balance you think it does more good than harm. Instead, what it says is, and if you read the cases that support the treatise, that if there is a way to build whatever structure you want to put in the water in such a way that it does not obstruct, usually the cases are talking about navigation, but presumably it would apply as well to fish. If you can do so, then it is a nuisance to fail to do so. And that is the reason why it's not a nuisance. Alito Are these cases involving actions taken by private parties or by governmental authorities? Tuchman Pardon? Alito Are these nuisance cases, cases involving actions taken by private parties or by the government? Tuchman By and large, there are actions taken by private parties. But what would Alito Do you think it's clear that the same standard applies to, under the common law, the same standard would apply to things that were done by the sovereign? Tuchman I think what you would need under the common law is a legislative enactment saying that whatever would otherwise be a nuisance is not a nuisance. We don't have that certainly from the Federal Government here. We also don't have anything of the sort from the State here. I'd also Alito Any of these issues discussed in the court of appeals? Tuchman Pardon? Alito Any of these issues discussed in the court of appeals? Tuchman Not with respect to the common law. But, again, we're not arguing that the Stevens Treaties incorporates the common law in all of its particulars, but it does go to the central question of whether there is substantive protection for the tribes' fisheries. We're not also resting solely on the common law. We're pointing to the course of negotiation between the parties, the fact that Washington's organic statute required that any structure put into a river or stream ensure fish passage. We're also relying on this Court's own cases, which have recognized that protection of the resource is the central concern of these treaties. If I could move to this 1 percent of historic harvest number that my friend gives, I think that's wrong both on the numerator and on the denominator. For the numerator, he's talking about a 200,000 fish figure that, first of all, this district court did not credit, and, second of all, comes from a 1997 State agency report that was based on 250 linear miles of habitat being opened up. But here we're talking about approximately 4 times that much, 1,000 linear miles. Moreover, with respect to the denominator, we're not talking about historical And here, absent the State's barrier culvert, there would be a substantial increase in the fish population. Sotomayor, what do we look at to see that the district court looked at that figure, the substantial increase? So I think for the benefits that you would get, you would look to pages 166 to 168 of the petition appendix. If you want to know about the harms, that would be at 157 to 162. Finally, my friend brought up the idea of partial obstructions. That is a forfeited, waived, and meritless argument. It's forfeited because it was raised for the first time in the reply brief before this Court. It's waived because it's contrary to the joint stipulation of the parties on which the district court relied, using the State's own definition of what it means to be a barrier culvert. And it's meritless because there is no such thing as a 10 percent barrier. So his argument was waived because he didn't make it until it got to this Court. Pardon? The argument you're talking about was waived by your friend on the other side because it wasn't raised until they got to this – until the case got to this Court. If you're making a new argument as to why it was that the district court abused its discretion, that is the type of argument that you would normally expect at a minimum to be brought up in the court of appeals, if not in the district court itself. Breyer, thank you for your answer. Ginsburg, did the United States pick up any of this tab? I mean, the principal State's objection is the cost to the State. And the United States has some simplicity in what went on. The United States pays tens of millions of dollars directly to the State in addition to all of the other efforts that it has undertaken to mitigate harms and to compensate  Thank you, counsel. Mr. Jay. Mr. Chief Justice, and may it please the Court, if the promise made by the United States in exchange for millions of acres of the tribe's land means anything in terms of substantive protection of the fishery, it protects against a threat to the fishery like these, a threat that obstructs fish from getting to the usual and accustomed fishing grounds where the tribes have a right to fish and that substantially degrades the fish population. And the idea that the State or a locality or even the United States can simply disregard that based on an agency's or an individual local government's balancing of its own perceived public interest against the promise made by the President, ratified by the Senate, is simply not consistent with the promises in the treaty or the background of the treaty. And I hate to keep asking the same question, but is substantial — does substantial degradation mean a number or significant degradation mean a number? And if so, what is the number? I don't think it means a hard and fast number. I think it is something that you would look at in context, in context of the particular species, in context of the strength of the species at a particular time. So I think that that would be something that you would determine factually in the context of one fish species versus another. But in this case, the district court found — I would look in particular at 162a of the Petition Appendix. Without giving a number, it said that the State's culverts are so numerous and cover so large an area that they are creating a significant total impact throughout the case area on the fishery. I mean, the — what happens here may or may not meet any definition of significant or substantial. That's not my question. But I just don't see how that can mean anything other than a number. And I still haven't gotten any answer that seems to give any substance to this. So you say it varies from fish species to fish species. Well, I think that it takes account of what kind of question you are asking. I mean, Justice Gorsuch's question mentioned the idea that 5 percent can be material in the context of securities fraud. We are not asking the Court to adopt, you know, the idea that 5 percent is material in all contexts, but we are — it would be a context — it would be sensitive to the context of a fishery. It would be — it would have to be, as my friend Mr. Kedem said, it would have to be something durable. In other words, not something that is simply washed out in the next year's returning fish population. And it would have to be something that materially affects the fish population year over year. So when you say materially affects, is that just a kind of — it can't be de minimis? But if it's not de minimis, then yes, there's an obligation. It certainly can't be de minimis. I mean, in our — the parties have not tried to draw the line between de minimis and substantial in this case. I think precisely because the State was litigating the case all along, not on the ground that its culverts were not having a substantial impact, but on the ground that it had no duty to refrain from having such an impact because the fishery was not protected in any sense by the treaty. Breyer. I don't know if we can decide a global standard for all of the Indian problems, but the question presented here — there are three questions. One was the scope of the remedy, too much. The second question was whether the government has to contribute in light of its equitable situation. But the first question was whether the treaty right of taking fish, in common with all citizens, guaranteed that the number of fish would always be sufficient to provide a moderate living to the tribes. That's the question presented. Now, you and the others have argued, and I did, it is true, that the judge in the lower court specifically denied that they were imposing that standard. They said, we're not doing that. But they think they were doing that. Maybe they didn't say it, but they were. All right. What do you recommend we do? We recommend that you look at what the injunction says and affirm it, because the injunction says nothing about a moderate living. The liability determination on which the injunction rests says at page 263 that the court specifically need not address what is a moderate living, because — and again, here I would turn to page 271 — the district court bases its liability ruling on what is a moderate living. It's not a moderate living holding. So we don't think that the State's characterization of the Ninth Circuit's opinion is correct, but you don't — you can simply write in your opinion that the judgment is affirmed and that you don't agree with the State's characterization or if it — But do you — do you agree with that, that it guarantees a moderate living, regardless of what you think the court said in the injunction? Is that the standard that you want us to adopt? It's not. We have characterized the idea of a moderate living as a defense that the State could have raised but did not. What we ask is that the — and what we obtain from the district court is an injunction prohibiting the State from taking affirmative action to obstruct and thereby degrade the fishery. Well, but you just told me you want us to affirm an injunction that specifies a moderate living. No. No, Your Honor. No? There's not a word about moderate living in the injunction. Not a word. Well, where did the words come from? Historically or in this case? In this case. In this case, the — as Mr. Kedem walked you through, the Ninth Circuit has two whole — two pieces of its analysis, starting at 158 and — that's not right — starting at 58 and continuing on until it gets to a place where it says, even if the treaty did not make this express promise and even if there weren't the express promises by Governor Stevens in the negotiation, even if we would infer such a promise and that's what we're doing here. We're analogizing to the Winters Doctrine. That is the section from which the State derives the supposed moderate living holding, but we think that the analogy to the Winters Doctrine actually helps to refute that. The Winters Doctrine is a doctrine whereby when Congress creates an Indian reservation, it doesn't expressly make provision for water. If water is necessary to fulfill the purpose of the reservation, it's inferred. But there's no— And just so I understand it, you're saying that that was not at issue, you never raised it, and the district court never considered it. The district court says at 163 that it's not considering it. The State says at footnote 75 of its summary judgment brief that it is not raising the moderate living defense. That's absolutely correct. And for that reason, what we think the Court should focus on is the actual basis for the injunction, the liability ruling and then the injunction itself and whether the injunction is an abuse of discretion. And how would you phrase that if not moderate living? What would be the standard that you think should be applied in interpreting the injunction? In interpreting the injunction? Well, we think that the reason the injunction was justified in this case is because the State has violated the treaty by, one, putting barrier culverts in the streams that prevent salmon and other anatomous fish from getting to the usual and accustomed fishing grounds, all of which, all of which are places where the tribes have a right to fish, and second, those blockages, those same blockages are what is degrading the fishery in a substantial way. Do your clients agree with the United States that the dams that were built by the United States are in compliance with the treaty? So let me give just a conceptual answer. The not all dams block fish passage. I mean, as my friend Mr. Kedem said, and as is reflected in section 18 of the Federal Power Act and its predecessor going back to 1906, various executive agencies have had the power to require fishways, you know, devices for ensuring fish passage around dams. So simply saying there were dams is not in any way to say there was an obstruction to fish passage. Yeah, I understand that, but there are particular dams on particular rivers, and I wonder if your clients have a position as to whether those are in compliance with the treaty, as the government has told us this morning. What I can say is that when the Federal Government has built dams without ensuring fish passage, that the Federal Government quite appropriately has paid compensation to the Indian tribes in exchange for the destruction of its usual and accustomed fishing grounds and the inability to take fish there. So certainly a dam or another obstruction that blocks a usual and accustomed fishing ground can be a violation, but there's nothing in the record in this case, because it has not been litigated, about particular dams that don't meet that standard. My friend from the State talked about the idea that the State's, some of the State's barriers are partial barriers, and there are a number of things I'd like to say about that. First is the idea that the common law did not prohibit partial barriers to passage. That is simply incorrect. I think that this is discussed in detail at pages 17 to 20 of the law professor's amicus brief. On page 20, it says it is, at this point, clear, this is in the 1800s, that partial barriers to fish passage are prohibited as well, and that is not surprising,  if a single particularly strong fish can get upstream. Now, there's, I'd be happy to go into great detail about what the test should be, but in this case, you don't have to get into that, because the State stipulated, stipulated expressly to the definition of barrier culverts. And that is why the injunction in this case is tailored to, number one, streams that are suitable for salmon only, number two, barrier culverts, using the State's own definition only, number three, barrier culverts that block a significant stretch of habitat. And it has a fourth safeguard as well, which is that the State can decline to remediate up to 10 percent of the habitat, which we think could add up to more than 200. Breyer. But there's still 600, there are about 600 and something left. Suppose they discover, because that's a lot of them when they go out there, that there are like five culverts somewhere, which would be unbelievably expensive to change, and moreover, it would really save only three fish or something. Now, suppose that they find that out. Can they go back into the district court and say, Judge, we would like you to modify this in respect to those five? That's exactly what, at page 125 of the Petition Appendix, you'll see that the court of appeals underscored that the district court retains equitable discretion under its course cases, applying Rule 60, to modify the injunction if changed circumstances warrant it. And the court of appeals said that it's confident that the district court, which has supervised this case, these proceedings, and this injunction for a long, long time, will exercise its discretion appropriately. Kagan. Kagan. Do you think, Mr. Jay, that this, that these treaty obligations differ at all from the reign in common law principles, and if so, how? Jay. I agree with what Mr. Kedem said, that the common law is a guide to what the, to what the treaty's protected right of taking fish means. I think that the reason that it is a guide and not, and not a codification rests in the fact that it is a treaty between the United States and the Indian tribes. Indian tribes, of course, were not thoroughly familiar with the English common law, but what the tribes did understand was that obstructions to the salmon fishery were a threat to the continued survival of the, of the species. That's why the tribes themselves had adopted the practice of removing obstructions to permit the survival. Kagan. But what I'm really asking is, when you look at the common law and you look at this treaty, do you see any difference between the two? And where would that difference be? Jay. The principal difference, I think, is on this point that Mr. Purcell brought up, the idea that there could be some public interest balancing. Now, we don't, we agree with Mr. Kedem that that's not what the common law says writ large about nuisance, but it is true that nuisance was a common law creation. The legislature could supersede nuisance in particular instances by passing a statute saying this shall not be a nuisance. The State and local governments don't have the power to do that because this right of taking fish is secured by a Federal treaty. So it's not that the treaty embodies only a promise that you will have the right of taking fish so long as the State and local governments decide not to abrogate it. Only Congress can abrogate a treaty with the Indian tribes, and that certainly makes sense given the exchange that is effected by these treaties. Sotomayor, what do I look at? I know the district court made certain findings about the cost of remediation. The State has always said it's $2.13 billion. I know the district court said that wasn't true, that on average the remediation of 12 or 15 culverts to date have cost on average $600,000. Jay. What can I look at to tell me what the cost is projected to be? I just need a realistic number, and I wasn't sure I got it from anybody.  I think, Your Honor, you've looked at the right parts of the opinion, and I would also point you to 119a where the court of appeals explains why the State's total estimate is, quote, demonstrably incorrect, close quote. $600 million is still a lot of money. I don't think it would be $600 million, but it's a bit. There's 600, on average, 600 culverts. You're right. He said it was like $650,000 per culvert, so you're right, maybe half that. It's still a lot of money. It is a lot of money, of course, in the context of the State's transportation budget. At that figure, we think it's about a half a percent of the State's transportation budget. I know there's some Federal money coming. There is Federal money coming in. There are other sources of funding as well that are remediating both State and local and private culverts. But I think that when looking at the cost, I think what you have to see is that much of the cost comes not from the designing of the culvert or what kind of culvert you put in, but the choice to remediate the culvert. Now, and it's very important to notice that Washington State has had a law requiring fish passage, and the Attorney General of Washington opined in 1950, 1950, that culverts installed by the State Highway Department under State roads had to meet those requirements for fish passage. So if the State decided not to do that and to install noncompliant culverts, culverts that block fish passage, and it's going to cost, you know, a fairly substantial sum to remediate them, the State bears a fair amount of that responsibility itself. Now, ultimately, the district court, in its discretion, looked at those costs, looked at the State's argument about whether it would be worthwhile, balanced the equities, and concluded that the balance of the harms tips substantially in the tribe's favor and in favor of the public interest. And I think that this is well brought out by the non-Indian fishermen's brief, both commercial and recreational fishermen, who explain in detail why it's very consistent with the public interest to resolve this problem on the tailored scale, a tailored timetable that the district court set out. Thank you, Mr. Chief Justice. Roberts. Thank you, counsel. Mr. Purcell, you have five minutes remaining. Thank you, Mr. Chief Justice. I'd like to make three points. First, counsel for the United States pointed you to paragraph 4.1 of Joint Appendix 62A. I'd urge you to turn to it and look at it. He stopped reading partway through. It says, has a duty not to build or maintain culverts in a way that deprives the tribes of a moderate living from fishing. Moderate living came from their — that's their complaint. That's the equivalent of their complaint in this case. The district court understood their complaint that way. If you look at Petition Appendix 250A, he described their claim as seeking a moderate living from fishing. The phrase moderate living appears dozens of times in the briefs to the Ninth Circuit. The phrase substantial degradation doesn't appear a single time in any brief to the Ninth Circuit. That was not the argument. So I raise that point not to emphasize that they should be barred from raising that argument here, but just to emphasize that if the court's going to adopt some version of that test, really the appropriate— in the context of State culverts, that appreciably degrade fish passage, and interfere with the tribe's ability to obtain a moderate. So they have to do both. One, appreciably degrade fish passage. And two, also interfere with the moderate standard. Isn't that what it says? That's what they claimed, Your Honor. Well, that's what it seemed to me to say. The district court essentially said the moderate living standard, any decline from that is a violation. And all the factual findings they're citing, Your Honor, keep in mind, that was after the district court had already held that the State violated the treaties. The violation finding was on summary judgment. And what the district court said, I encourage you to turn to actually the same page that Mr. Jay said, Petition Appendix 263A. The district court said, the tribes showing that harvests have been diminished together with the logical inference that a significant portion of this diminishment is due to block coverts is sufficient to support a finding of a treaty violation. So you know, I have read the language. I don't understand exactly why the district court did it. I think the circuit court tried to clarify it. But as I understand things, the Indians are entitled to 50 percent, but we have said it doesn't have to be more than a moderate living. So it could be less than 50 percent of whatever the catch is. Am I correct on that? In Fish and Vest, the court said that each side is entitled to half the available fish. Right. And unless? Unless less than that is sufficient to provide a moderate living. Exactly. As I understand what the government said to me earlier, you stipulated that a moderate living wasn't at issue. So you weren't claiming, I don't think, as a defense, that the existing catch was more than sufficient or exceeded a moderate living by so much that we didn't have to fix the coverts because of that reason. We said we would not dispute that the tribes were not currently earning a moderate living from fishing. And that's why the district court said I don't need to define this term. So it doesn't really matter. Once there's significant degradation, that means they're not getting 50 percent of what they need. No, Your Honor. This Court in Fish and Vest said 50 percent is the maximum, even if it's less than the tribes' moderate living needs. That's what the Court said in Fish and Vest. But what I'm saying to you is if you stipulated that they're not making a moderate living, they're still entitled to 50 percent of the undegradated catch. That's not what the Court held in Fish and Vest at all, Your Honor. The Court held 50 percent of the currently available catch. If that had been the rule, they would have been entitled to every single fish. The undegradated catch, Your Honor, would be tens of millions of salmon. And it's undisputed that the runs have declined vastly long before the State billed any coverts. That's not what the Court said. Sotomayor, my words are wrong. They caught X amount. If the proof is that Y amount would have happened absent the obstruction, they're entitled to 50 percent of Y amount. I don't care what caused this. Again, that's not the Court's approach the Court took in Fish and Vest. Unless the Court's going to remand with some sort of direction that the – I would urge the Court that if you're going to say some version of that, the appropriate course is to remand to the district court, because the district court just did not consider these arguments. The district court – I mean, we didn't waive the idea that these aren't all obstructions. That wasn't an issue. The common law definition of obstruction was never raised in the district court by the other parties. We had no opportunity to make that point. We did in our post-trial brief, again, at Joint Appendix 28. We argued extensively about the flaws in the injunction, every single flaw. Justice Breyer asked, why can't we go back to the district court? We already pointed out all of these flaws to the district court, and he ignored them and entered the exact injunction that they proposed. And so that's the concern. It flips the burden of proof on its head to say, okay, we're going to assume that all State barrier culverts, regardless of where they are or anything about the river or anything like that, is a violation, and then you can go back and ask for relief. I see my time has expired. Thank you. Thank you, counsel. The case is submitted.